**Mandamus Denied and Dissenting Opinion Issued April 30, 2026.**



**In The**

# Fifteenth Court of Appeals

---

**NO. 15-25-00207-CV**

---

**IN RE NOVARTIS PHARMACEUTICALS CORPORATION, Relator**

---

**ORIGINAL PROCEEDING**
**WRIT OF MANDAMUS**
**71st District Court**
**Harrison County, Texas**
**Trial Court Cause No. 23-0276**

---

## DISSENTING OPINION

Six months ago, two justices of the Texas Supreme Court signed an opinion requesting our Court's views *in this very case* on two constitutional questions: (1) whether a for-profit litigation fund has standing to seek civil penalties in a claim under the Texas Health Care Program Fraud Prevention Act ("the Act"); and (2) whether that Act's delegation to any private person whatsoever to bring such claims violates the Separation of Powers clause in the Texas Constitution. *See In re Novartis Pharm. Corp.*, 722 S.W.3d 720, 720 (Tex. 2025) (Young, J., and Sullivan, J.,

1

concurring in denial of petition for writ of mandamus). I am chagrined that our Court's response is: "No thanks."

I have neither sympathy nor tolerance for scoundrels who use fraud to get rich at the expense of public health and welfare programs. But I would not construe the Legislature's response in the Act here, much less any provision of the Texas Constitution, to encourage venture capitalists to file claims in state court that the federal courts have repeatedly rejected because they threaten to cut off services that actually *benefit* health care programs. The question here is who can exercise the State's executive power to punish public companies with civil penalties when the State's constitutional officials choose not to do so. The Attorney General has a statutory right to take over this claim and either pursue or dismiss it, but need not do either. Whether to encourage privateers to perform this public duty instead by offering jackpots far beyond any amount the State could possibly have lost, and based only on the kind of legalistic "fraud" alleged here, is a policy choice for the Legislature. But whether it exceeds constitutional limits is for the courts.

I do not fault my colleagues for hesitating to shoulder the burden of analyzing the difficult issues here. But our Court was created for this kind of case, and it is our duty to decide it. As I must proceed alone without benefit of oral argument or insight from my colleagues, any errors of commission or omission below are mine alone.

Angels do not run for public office; so the difficulty in framing a government is that "you must first enable the government to control the governed; and in the next place oblige it to control itself." THE FEDERALIST No. 51, at 322 (James Madison) (Clinton Rossiter ed., 1961). The constitutional requirements of standing and separation of powers are fundamental to obliging governments to control themselves. Because the majority declines to consider or enforce those requirements here, I respectfully dissent.

# BACKGROUND

"Texas Medicaid is the largest program funded by the state government and covers health care services for nearly five million Texans."[1] Like any government program that dispenses vast amounts of money, fraud is not completely unexpected—but is not to be tolerated.

The Act was originally adopted in 1995, then immediately amended in the 1997 legislative session to add its qui tam provisions.[2] Taken as a whole, it "is a powerful tool for targeting fraud against the Texas Medicaid program and securing the program's integrity."[3] Among other incentives, the Act encourages insiders and whistleblowers to disclose abuses by offering substantial financial awards in suits filed on the State's behalf.[4] To increase that incentive, the civil remedies provided by the Act are "undeniably punitive in the aggregate, imposing monetary liability far surpassing the amount of Medicaid funds the State may have actually expended due to an unlawful act."[5]

According to the plaintiff's petition here, Health Selection Group, LLC ("HSG") is an affiliate of National Health Care Analysis Group ("NHCA"), "a research organization based in New Jersey." Its business plan is simple: file qui tam suits in state and federal courts nationwide.[6] Its standard target has been so-called

---

[1] Senate Research Ctr., Bill Analysis, Tex. S.B. 745, 88th Leg., R.S. (2023).

[2] Act of May 26, 1995, 74th Leg., R.S., ch. 824, § 1, 1995 Tex. Gen. Laws 4202, 4203–4208 (original enactment); Act of June 2, 1997, 75th Leg., R.S., ch. 1153, § 1.03, 1997 Tex. Gen Laws 4234, 4326–4327 (adding qui tam provisions).

[3] *In re Xerox Corp.*, 555 S.W.3d 518, 525 (Tex. 2018).

[4] *Id*. at 538.

[5] *Id*. at 527.

[6] *See, e.g., United States v. Eli Lilly & Co., Inc.*, 4 F.4th 255, 259 (5th Cir. 2021) (noting that the two plaintiffs "are both entities created by the National Health Care Analysis Group for the purpose of filing qui tam actions alleging instances of fraud in medicine and pharmaceuticals");

"white coat marketing" programs sponsored by drug manufacturers, under which medical providers are offered free services from registered nurses and administrative staff to help educate patients, support and inform medical staff, and handle the labor-intensive Medicaid reimbursement process. While free services of this nature seem like the kind of "customer support" provided by most retailers today, NHCA and its affiliates claim they are actually illegal "kickbacks" because doctors, hospitals, and patients would have to pay for them if the pharmaceutical companies did not.[7]

These claims have fared poorly in federal court. The Fifth Circuit in 2021 dismissed large numbers of them (including 11 qui tam suits filed by HSG affiliates[8]) at the request of the federal Department of Justice (DOJ), which after a two-year investigation concluded that these free services "benefit federal healthcare programs by providing patients with greater access to product education and support."[9] The

---

*affirming Health Choice All., LLC v. Eli Lilly & Co., Inc*., 2019 WL 5691988, at *1 (E.D. Tex. June 20, 2019) ("NHCA Group, acting through various limited liable companies, filed twelve qui tam actions nationwide making substantially the same allegations asserted in the cases before the Court."); *see also In re Shire PLC*, 633 S.W.3d 1, 9 (Tex. App.—Texarkana 2021, orig. proceeding) (stating NHCA was created by investors "for the purpose of pursuing false claims act litigation," and "acting through various shell companies" had filed scores of virtually identical claims in qui tam actions in federal and state courts "across the country, against dozens of pharmaceutical companies.").

[7]    *See* TEX. HUM. RES. CODE § 36.002(5) ("A person commits an unlawful act if the person, except as authorized under the Medicaid program, knowingly pays, charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or product or the continued provision of a service or product if the cost of the service or product is paid for, in whole or in part, under the Medicaid program."); *id.* § 32.039(b)(5): ("A person commits a violation if the person: offers or pays, directly or indirectly, overtly or covertly any remuneration, including any kickback, bribe, or rebate, in cash or in kind to induce a person to refer an individual to another person for the furnishing of, or for arranging the furnishing of, any item or service for which payment may be made, in whole or in part, under the medical assistance program, provided that this subdivision does not prohibit the referral of a patient to another practitioner within a multispecialty group or university medical services research and development plan (practice plan) for medically necessary services.").

[8]    *See Eli Lilly*, 4 F.4th at 259.

[9]    *Id*. at 260, 267.

Seventh Circuit did the same in 2020, again based on DOJ's citation to "nine cited agency guidances, advisory opinions, and final rulemakings" that concluded the claims were "contrary to the public interest,"[10] were filed by "investment vehicles for financial speculators … against an entire industry," and "would undermine ... practices the federal government has determined are ... appropriate and beneficial to federal healthcare programs and their beneficiaries."[11]

Undeterred, qui tam parties like HSG have filed similar white-coat-marketing lawsuits in Texas state courts against Novartis and others, primarily in Harrison County.[12] This is the third mandamus petition from such cases to come before this Court in our short tenure; in the first two we (*i*) held that such cases fall within our exclusive intermediate appellate jurisdiction over "matters brought by or against the state"[13]; and (*ii*) granted mandamus relief because venue in Harrison County was improper.[14]

The current suit was filed by HSG against Novartis in May of 2020, and alleges that "[f]or at least a decade, Novartis has fraudulently engaged in unlawful marketing schemes." While the petition does not state a total amount requested, it seeks disgorgement of "any payment" Medicaid made resulting from an unlawful act by Novartis,[15] which it alleges reaped "hundreds of millions of dollars from Texas

---

[10]     *United States v. UCB*, *Inc*., 970 F.3d 835, 840, 852 (7th Cir. 2020).

[11]     *Id*. at 852.

[12]     *See, e.g., In re Gilead Sciences, Inc*., 2021 WL 4466006, at \*1 (Tex. App.—Texarkana Sept. 30, 2021, orig. proceeding); *In re Shire PLC*, 633 S.W.3d 1, 8 (Tex. App.—Texarkana 2021, no pet.).

[13]     *See* TEX. GOV'T CODE § 22.220(d)(1).

[14]     *See In re AstraZeneca Pharm. LP*, 726 S.W.3d 573, 575 (Tex. App.—15th Dist. 2025, orig. proceeding); *In re Sanofi-Aventis U.S. LLC*, 711 S.W.3d 732, 735 (Tex. App.—15th Dist. 2025, orig. proceeding).

[15]     *See* TEX. HUM. RES. CODE § 36.052(a)(1) ("[A] person who commits an unlawful act is

5

Medicaid." It also seeks civil penalties of not less than $5,500 for each unlawful act.[16] Since the Act's six-year statute of limitations would extend back to May of 2014,[17] broadly interpreted the petition could include everything Novartis sold in Texas for the last 12 years.

Despite the size and scope of the remedies sought and the State's entitlement to much of any recovery,[18] the Attorney General has declined to exercise his right to either take over the case or dismiss it.[19] His office has filed substantial briefs opposing on legal grounds the constitutional challenges Novartis has raised in three Texas appellate courts, but has yet to take any position on the merits of HSG's claim or to address the DOJ's conclusion that white-coat-marketing lawsuits threaten to do more harm than good to the Medicaid system.

## DISCUSSION

"Mandamus relief is appropriate to correct a clear abuse of discretion when there is no adequate remedy by appeal."[20] The majority declines review or relief in this case because "an appellate remedy is not inadequate merely because of the cost or delay of going through trial and the appellate process."[21]

But this is a *mass tort* case, involving millions of sales calls, office visits, prescriptions, and Medicaid reimbursements going back a dozen years. If there are valid obstacles to any recovery here, the huge number of claims renders a plenary

---

liable to the state for [] the amount of any payment or the value of any monetary or in-kind benefit provided under a health care program, directly or indirectly, as a result of the unlawful act.").

[16]   *See id*. § 36.052(3).

[17]   *See id*. § 36.104(b).

[18]   *See id*. § 36.110(a-1), (b).

[19]   *See id*. § 36.102(c), .104(b-1), .107(a), (b).

[20]   *In re Madison*, 722 S.W.3d 864, 866 (Tex. 2025).

[21]   *Ante* at 2–3.

6

trial impracticable, and the waste of judicial and public resources irreversible (*see part I*). Two such obstacles to recovery are asserted here: that a private investment company like HSG (*i*) has no constitutional standing to file suit since it has suffered no harm whatsoever from real or imagined Medicaid fraud in Texas (*see part II.A*), and (*ii*) cannot exercise the State's executive power to punish wrongdoers when the constitutional officials elected for that purpose decline to join (*see part II.B*). Because I agree, I would grant mandamus relief to correct a clear abuse of discretion for which there is no adequate remedy by appeal.

## I.      No Adequate Remedy: Mandamus Review of Mass Torts

The majority concedes that the issues here "are indeed weighty and are of significant importance."[22] Yet it declines to address them because the Texas Supreme Court "has long held" (in cases from 22, 35, and 68 years ago) that "the mere cost and delay of pursuing an appeal will not, in themselves, render appeal an inadequate alternative to mandamus review."[23] But the majority fails to mention that this is not a per se rule, "is not the only factor we consider in deciding whether mandamus is appropriate,"[24] and requires considering other factors like "the burden of the litigation," whether an order "radically skew[s] the procedural dynamics of the case," and the "waste of judicial and public resources."[25] Treating "mere" cost and delay as a dispositive factor "gives *Walker v. Packer* and its principles short shrift."[26]

In *In re Prudential Insurance Co. of America* in 2004, the Supreme Court held

---

[22]      *Ante* at 2.

[23]      *Ante* at 2–3 (quoting *In re Entergy Corp.*, 142 S.W.3d 316, 321 (Tex. 2004); *Hooks v. Fourth Court of Appeals*, 808 S.W.2d 56, 60 (Tex. 1991); *Iley v. Hughes*, 311 S.W.2d 648, 652 (Tex. 1958)).

[24]      *In re Entergy Corp.*, 142 S.W.3d 316, 321 (Tex. 2004).

[25]      *In re Kappmeyer*, 668 S.W.3d 651, 659 (Tex. 2023).

[26]      *In re AIU Ins. Co.*, 148 S.W.3d 109, 116 (Tex. 2004) (citing *Walker v. Packer*, 827 S.W.2d 833 (Tex. 1992)).

that "whether an appellate remedy is 'adequate' so as to preclude mandamus review depends heavily on the circumstances presented and is better guided by general principles than by simple rules."[27] Indeed, "rigid rules are necessarily inconsistent with the flexibility that is the remedy's principal virtue."[28] That has been Texas law for some time now; as the Court wrote in 2021, "we clarified in *Prudential* that a flexible mandamus standard means that in some circumstances the irreversible waste of judicial and public resources that would be required absent mandamus relief justifies granting such relief."[29] For the reasons that follow, declining to grant review here ensures such an irreversible waste for many years ahead.

## A. Mass torts involve "*monumental*" cost and delay

HSG alleges just two statutory claims against one defendant. But its claims against Novartis encompass unlawful acts involving hundreds of thousands of patients and thus allege claims that meet the definition in Black's Dictionary of a "mass tort": "A civil wrong that injures many people."[30]

Novartis is one of the largest pharmaceutical companies in the world.[31] HSG's first amended petition alleges that Novartis committed unlawful acts by hiring nurses to recommend its products and answer questions from patients, doctors, and staff on how to use them, and by providing staff support to customers for claim reimbursement from Medicaid. The 60-page petition is broad enough to include

---

[27]     148 S.W.3d 124, 137 (Tex. 2004) (quoted in *Kappmeyer*, 668 S.W.3d at 659).

[28]     *Id*. at 136.

[29]     *In re Acad., Ltd*., 625 S.W.3d 19, 35–36 (Tex. 2021) (quoting *In re Prudential*, 148 S.W.3d at 137).

[30]     *Mass Tort*, BLACK'S LAW DICTIONARY 1799 (12th ed. 2024).

[31]     Lyle Daly, *The Largest Healthcare Companies by Market Cap in April 2026*, The Motley Fool (Apr. 6, 2026, 5:11 PM) https://www.fool.com/research/largest-healthcare-companies/?utm_ source=yahoo-host-full&utm_medium=feed&utm_cmpaign=article&referring_ guid=f4b94a84-80fa-447e-b923-e088dc39add2.

every sales call, doctor's office visit, prescription, phone call, and reimbursement claim involving Novartis since 2014, sweeping into this litigation literally *millions* of transactions going back a dozen years. Few cases in Texas legal history have ever demanded so much on behalf of so many against so few.

The term "mass torts" made its debut in Texas caselaw in 1990,[32] and for some years thereafter was the *primary driver* behind the expansion of mandamus review, as well as a frequent subject of relief. That is because the "mass" in a mass tort imposes on a defendant "*monumental*" costs and delays (as the Supreme Court wrote in *Able Supply Co. v. Moye* in 1995), leaving them "without an adequate remedy at law":

> The refusal of the plaintiffs to provide a medical link between a particular plaintiff and a particular product at this point in time puts every defendant in the position of having to defend every case until all are tried, which constitutes a *monumental waste* of judicial resources. The burden imposed by requiring 294 defendants to continue to defend the claims of over 3,000 plaintiffs while awaiting a thirty-day window prior to trials that have yet to be scheduled before discovering which defendants are implicated is far out of proportion to any benefit to the plaintiffs in withholding this basic information.[33]

The Court noted again the potential for monumental waste in *In re Allied Chemical Corp.* in 2007, holding that appeal was not an adequate remedy when 1,900 plaintiffs had no expert to connect their injuries to a defendant's product:

> Filing thousands of claims like those here requires only a reasonable inquiry and belief that they are not groundless; recovering on them requires considerably more. In the meantime, thousands of hours and millions of dollars may be needlessly wasted if the claims can never be proved. Mandamus is appropriate in such cases to avoid this

---

[32]    *See Celotex Corp. v. Tate*, 797 S.W.2d 197, 209 (Tex. App.—Corpus Christi–Edinburg 1990, writ dism'd by agr.).

[33]    *Able Supply Co. v. Moye*, 898 S.W.2d 766, 771–72 (Tex. 1995) (emphasis added).

9

*monumental waste* of judicial resources.[34]

And in 2008, the Court held in *In re McAllen Medical Center*[35] that appeal is not an adequate remedy in a negligent credentialing suit against a hospital by 224 former patients when the only expert report they had was signed by a solo practitioner with no expertise in hospital credentialing:

> Unquestionably, the hospital could have avoided significant expense and delay had the trial court followed the law as set out in the [expert report] statute; unquestionably, the hospital will continue to incur costs and delay in the future if we deny relief today. Being relegated to a wasted trial followed by eventual justice someday on appeal is not an adequate remedy. Accordingly, we hold the hospital has shown it has no adequate remedy by appeal.[36]

The rule the Court states today—that "mere" cost and delay is not enough to render appeal inadequate—is not a general rule for mass tort cases. It omits a "significant factor" the Supreme Court noted 30 years ago in *CSR Limited v. Link*: "The large number of lawsuits to which CSR could potentially be exposed is *significant* to our determination that *appeal is not an adequate remedy* in this case."[37]

## B. Mass tort cases rarely go to trial

The majority holds that mandamus review now "is premature because there is currently an adequate remedy by appeal" once this case goes to trial.[38] But that will likely never happen, as the relevant acts are far too numerous to present in a single trial to a court or jury.

As already noted, HSG's claims against Novartis implicate literally millions

---

[34]     *In re Allied Chemical Corp.*, 227 S.W.3d 652, 658 (Tex. 2007) (emphasis added).

[35]     275 S.W.3d 458, 462 (Tex. 2008).

[36]     *Id.* at 467.

[37]     925 S.W.2d 591, 596 (Tex. 1996) (emphasis added).

[38]     *Ante* at 2.

10

of transactions going back a dozen years. HSG claims that the free services provided were actually "kickbacks" because Novartis provided them for free "as a condition" or "to induce" buying its products.[39] That would appear to require proof that each sales call, office visit, prescription, phone call, or help with reimbursement not only occurred, but was a "condition" to or "induced" a sale. At trial, HSG will inevitably present selected evidence about a few such instances to support its claims, and Novartis will present selected evidence about a few such instances that do not. The problem is that neither due process nor logic would allow jurors or judges to infer what happened in millions of other transactions without evidence of them.[40]

The briefs do not suggest that any such claim "has ever been tried or appealed in Texas," indicating that the claim "is immature."[41] "Scholars and courts have recognized that a mass tort has a life cycle," reaching maturity only when "there has been full and complete discovery, multiple jury verdicts, and a persistent vitality in the plaintiffs' contentions."[42] None of that has occurred here. In immature torts, Texas courts are required to exercise "extreme caution" before combining such claims in a single trial,[43] and appeal is not an adequate remedy if they fail to do so:

> [C]onsolidation risks the jury finding against a defendant based on sheer numbers, on evidence regarding a different plaintiff, or out of reluctance to find against a defendant with regard to one plaintiff and not another…. Juror confusion and prejudice, under these facts, is almost certain, and it would be impossible for an appellate court to

---

[39] *See* TEX. HUM. RES. CODE §§ 36.002(5); 32.039(b)(1-d).

[40] *See, e.g., Nissan Motor Co. Ltd. v. Armstrong*, 145 S.W.3d 131 (Tex. 2004) (reversing court of appeals' conclusion that "the sheer number and nature of reported incidents raise an inference that the unintended acceleration or stuck throttle was caused by something other than driver error").

[41] *In re Van Waters & Rogers, Inc.*, 145 S.W.3d 203, 208 (Tex. 2004).

[42] *In re Ethyl Corp.*, 975 S.W.2d 606, 610 (Tex. 1998) (quoting Francis E. McGovern, *An Analysis of Mass Torts for Judges*, 73 TEX. L. REV. 1821, 1841–45 (1995)).

[43] *In re Van Waters,* 145 S.W.3d at 208.

untangle the confusion or prejudice on appeal.[44]

Justice Raul Gonzalez noted 30 years ago that even if a case is meritless, "defendants must take a hard look at whether they can afford to defend a case regardless of the merits."[45] He cited a case pending for eight years without any supporting evidence, in which "many defendants have felt compelled to settle for millions of dollars and cut their losses. By September 1994, nearly 200 defendants had settled for more than $66 million, and it is not clear that the case is any closer now to being tried than when it was filed."[46]

Settlement of valid mass tort claims is far more efficient than attempting to try each claim individually. But mandamus review that separates *valid* from *invalid* claims promotes settlement by providing useful information about the viability of the claims or defenses at issue. Given the likelihood that the claims here will never be tried, we do a disservice by pretending we will address them at some time in the distant future.

## C. Subject-matter jurisdiction in mass torts cannot be postponed to the end

Novartis argues that HSG's suit is barred by two provisions of the Texas Constitution, either of which would deprive courts of subject-matter jurisdiction here. First, Novartis asserts that HSG lacks *standing* because it is a non-Texas LLC with no constitutional injury whatsoever arising from any alleged abuse of state health care programs. Second, Novartis asserts that HSG's suit for punitive civil remedies violates the *separation of powers* clause absent participation by a member

---

[44]     *Id.* at 211.

[45]     *CSR*, 925 S.W.2d at 598 (Gonzalez, J., concurring).

[46]     *Id.* (citing Skip Hollandsworth, *The Lawsuit from Hell*, TEXAS MONTHLY, June 1996, at 145; *available at* https://www.texasmonthly.com/news-politics/the-lawsuit-from-hell/).

of the State's executive branch to whom such powers are constitutionally assigned.[47] If Novartis is correct on either point, neither this Court nor the court below has subject-matter jurisdiction, which is "essential to a court's power to decide a case."[48]

It is completely backwards to wait for a trial on the merits before deciding if Texas courts have subject-matter jurisdiction to try the merits. Subject-matter jurisdiction "is always an antecedent requirement before a court may address the merits."[49] A trial court "must determine at its earliest opportunity whether it has the constitutional or statutory authority to decide the case before allowing the litigation to proceed."[50] "When a court lacks jurisdiction over a case, the only correct disposition is dismissal because the court lacks power to do anything else."[51]

We do not have to review by mandamus every case challenging subject-matter jurisdiction. The issues here come before us under Rule 91a, which requires prompt filing and disposition based solely on the pleadings.[52] In many cases, marshaling the relevant evidence in the trial court may be quicker and cheaper than trying to decide them from the face of the pleadings in a court of appeals.[53] But that will rarely be the case in mass torts. Moreover, the standing and separation of powers objections that Novartis raises here are pure legal questions, and no amount of discovery or

---

[47] *See* TEX. CONST. art. IV, § 22 ("The Attorney General shall represent the State in all suits and pleas in the Supreme Court."); *id.* art. V, § 21 (providing that county attorneys and district attorneys "shall represent the State in all cases in the District and inferior courts in their respective counties").

[48] *Texas Right to Life v. Van Stean*, 702 S.W.3d 348, 352 (Tex. 2024) ("The standing requirement derives from the Texas Constitution's provision for separation of powers among the branches of government, which denies the judiciary authority to decide issues in the abstract.").

[49] *Id.* at 351.

[50] *In re Lazy W Dist. No. 1*, 493 S.W.3d 538, 544 (Tex. 2016) (quoting *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004)).

[51] *Kelley v. Homminga*, 706 S.W.3d 829, 833 (Tex. 2025).

[52] *See* TEX. R. CIV. P. 91a.3.

[53] *See In re Essex Ins. Co.*, 450 S.W.3d 524, 528 (Tex. 2014).

13

delay in the trial court can change them. As the Supreme Court wrote 18 years ago in *In re McAllen Medical Center*: "The most frequent use we have made of mandamus relief involves cases in which the very act of proceeding to trial—regardless of the outcome—would defeat the substantive right involved."[54] The substantive right here is *not* to be forced into an impracticable trial in a court without subject-matter jurisdiction; by denying relief today, the majority does exactly that.

## D. This Court was created to address cases like this

Finally, treating this petition as about nothing more than "mere" cost and delay ignores what this Court was created to do. We sit on a tribunal designed "to give special attention to those cases the Legislature has defined as critical to the State's interests," and we exercise statewide jurisdiction so "all Texas voters have a say in electing the justices who decide cases affecting the State's interests[.]"[55] Considering the amount of money involved here and the potential for collateral harm to the State's health care programs, this is one of those cases.

"In addition to protecting substantial rights from impairment or loss, mandamus review may be proper in select cases to afford appropriate guidance to the law."[56] We have exclusive intermediate appellate jurisdiction of qui tam cases because they are "brought by or against the state."[57] While in many instances it is beneficial for issues to percolate among several courts of appeals to obtain a broader perspective, our exclusive jurisdiction prevents that here. Since we must decide issues like these sooner or later we should do so now, comforted by the fact that we

---

[54]    275 S.W.3d 458, 465 (Tex. 2008); *accord In re Illinois Nat'l Ins. Co.*, 685 S.W.3d 826, 842–43 (Tex. 2024).

[55]    *Kelley*, 706 S.W.3d at 832, 834.

[56]    *In re State Farm Mut. Auto. Ins. Co.*, 712 S.W.3d 53, 66 (Tex. 2025).

[57]    *See In re Sanofi-Aventis U.S. LLC*, 711 S.W.3d 732, 736 (Tex. App.—15th Dist. 2025, orig. proceeding); *see also* TEX. GOV'T CODE § 22.220(d)(1).

are not the last stop if we err.

Nor should we ignore the notable request by two justices of the Supreme Court asking for our "analysis in a written opinion" *of the issues in this very case*, as it could "greatly assist" that Court.[58] Two justices do not speak for the Court, but we cannot infer that the others disagreed since "failure to grant a petition for writ of mandamus is not an adjudication of, nor even a comment on, the merits of a case in any respect, including whether mandamus relief was available."[59] "Although mandamus review is generally a matter within our discretion, our place in a government of separated powers requires us to consider also the priorities of the other branches of Texas government."[60] Similarly, our place in a system of superior and inferior courts ought to require something more than our Court does here.

## II. Abuse of Discretion: Standing and Separation of Powers

### A. Constitutional standing

In Texas, "the standing inquiry begins with determining whether the plaintiff has *personally* been injured, that is, he must plead facts demonstrating that he, himself (rather than a third party or the public at large), suffered the injury."[61] HSG does not allege that it *personally* suffered any injury from health care fraud in Texas. Its first amended petition seeks treble damages and civil penalties "on behalf of Texas," and a substantial share of that recovery for itself as qui tam plaintiff. As a matter of law, HSG filed this lawsuit not as an injured party, but as a volunteer.

HSG claims it has constitutional standing because the Act "partially assigns

---

[58]     *In re Novartis Pharm. Corp.*, 722 S.W.3d 720, 723–24 (Tex. 2025) (Young, J., and Sullivan, J., concurring in denial of petition for writ of mandamus).

[59]     *In re Bowen*, 720 S.W.3d 715, 716 (Tex. 2025).

[60]     *In re McAllen Med. Ctr., Inc.*, 275 S.W.3d 458, 461 (Tex. 2008).

[61]     *Meyers v. JDC/Firethorne, Ltd.*, 548 S.W.3d 477, 485 (Tex. 2018) (internal quotation marks omitted).

the State's claims against Novartis" to private qui tam parties like itself, and as an assignee of the State's injury-in-fact it stands in the State's boots. The Act does authorize suit by any private person,[62] which could include not only the insiders and whistleblowers the Legislature intended,[63] but also idle law firms, Novartis's business competitors, or those willing to gamble on litigation like HSG—even if not personally aggrieved. But constitutional standing cannot be created by statute. The distinction between statutory capacity to sue and constitutional standing to sue "is critical because standing, as that term is properly used, implicates subject-matter jurisdiction,"[64] and "a court without subject-matter jurisdiction cannot decide the case at all."[65] If constitutional standing exists, the Legislature can confer a private cause of action on a particular plaintiff.[66] But "[f]or the Legislature to attempt to authorize a court to act without subject matter jurisdiction would violate the constitutional separation of powers."[67]

The real parties point out that 25 years ago the U.S. Supreme Court held that qui tam relators met federal Article III standing requirements, because the federal

---

[62]     TEX. HUM. RES. CODE § 36.101(a) ("A person may bring a civil action for a violation of Section 36.002 for the person and for the state."); TEX. GOV'T CODE § 311.005(2) ("'Person' includes corporation, organization, government or governmental subdivision or agency, business trust, estate, trust, partnership, association, and any other legal entity.").

[63]     *See In re Xerox*, 555 S.W.3d at 538.

[64]     *Tex. Right to Life*, 702 S.W.3d at 354.

[65]     *Texas Med. Res., LLP v. Molina Healthcare of Tex., Inc.*, 659 S.W.3d 424, 440 (Tex. 2023).

[66]     *Busbee v. County of Medina*, 681 S.W.3d 391, 395 (Tex. 2023); *Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 773–74 (Tex. 2020); *see Finance Comm'n of Texas v. Norwood*, 418 S.W.3d 566, 582 n.83 (Tex. 2013) ("[C]ourts' constitutional jurisdiction cannot be enlarged by statute.").

[67]     *In re Lazy W Dist. No. 1*, 493 S.W.3d 538, 544 (Tex. 2016). Both real parties quote the Supreme Court's statement in *Brown v. de la Cruz* that "the Legislature may grant private standing to bring such actions [for civil penalties], but it must do so clearly." 156 S.W.3d 560, 565 (Tex. 2004). But the question in *Brown* was whether to imply a private cause of action for penalties, not whether—as here—bestowing a cause of action on an uninjured party would satisfy constitutional standing. *See id.* at 568.

16

False Claims Act "can reasonably be regarded as effecting a partial assignment of the Government's damages claim."[68] The federal act provides for remedies based on "the amount of *damages* which the Government sustains because of the act of that person."[69] Texas law recognizes that compensatory damages are generally assignable;[70] if the Texas Act provided similar remedies, then they could be assigned to and enforced by an assignee to the extent generally allowed by Texas law.[71]

But the civil remedies in the Texas Act are entirely punitive, not compensatory, "imposing monetary liability far surpassing the amount of Medicaid funds the State may have actually expended due to an unlawful act," and *regardless* of whether there was any actual damage to the State or any beneficiary.[72] Texas law generally does not allow assignment of punitive claims.[73] Unlike compensatory damages, punitive damages have a personal and retributive aspect that sets them apart from compensation.[74] Punitive damages can skew the adversarial process by encouraging entrepreneurial bystanders who suffered no loss to intervene purely for

---

[68] *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 773 (2000).

[69] 31 U.S.C. § 3729(a)(1)(G) (emphasis added).

[70] *See* Tex. Prop. Code § 12.014(a).

[71] *See, e.g., Seiter v. Marschall*, 147 S.W. 226, 228 (Tex. 1912) (partial assignee of claim had an undoubted right to pursue enforcement "to the extent of his interest"); *Jackson v. Fawlkes*, 20 S.W. 136, 136 (Tex. 1892) (partial assignee of note had standing to enforce it).

[72] *In re Xerox*, 555 S.W.3d at 527 (concluding that TMFPA civil penalties "are penalties, not damages").

[73] *See PPG Indus., Inc. v. JMB/Houston Centers Partners Ltd. P'ship*, 146 S.W.3d 79, 83–92 (Tex. 2004); *see also Texas Med. Res., LLP v. Molina Healthcare of Texas, Inc.*, 659 S.W.3d 424, 439 (Tex. 2023) (holding that personal and punitive aspect of statutory claim for failing to attempt to settle in good faith could not be assigned).

[74] *Cf. Goldstein v. Sabatino*, 690 S.W.3d 287, 292 n.7 (Tex. 2024) (noting that one factor distinguishing civil from criminal law is "whether its operation will promote the traditional aims of punishment—retribution and deterrence" (citing *In re Commitment of Fisher*, 164 S.W.3d 637, 647 (Tex. 2005))).

profit, and may encourage a plaintiff to collude with one wrongdoer to target another with deeper pockets.[75]

Finally, HSG argues that it has standing as a "representative" of the State, like a receiver, trustee, next friend, guardian ad litem, executor, or appointee under a power of attorney. But in those cases, the party on whose behalf the suit is filed will be bound by the result obtained by the representative. The State stands to benefit from the proceeds of any successful qui tam suit, but does not concede it will be bound by the results of an unsuccessful suit or by any concessions made by a private party appearing on its "behalf" therein. HSG cannot be a true representative of the State if it acts on the State's behalf only in fair weather and not in foul.

## B. Constitutional separation of powers

Novartis asserts that the Act violates the Texas Constitution's separation-of-powers provision by allowing private parties like HSG to file suit "in the name … of the state" and "for the state."[76] The Constitution plainly provides that the attorney general and local district and county attorneys "shall represent the State" in state courts, plus perform other duties assigned to them by state law.[77] But nothing in the Constitution authorizes the Legislature to delegate to private parties the State's power to impose civil penalties without the participation of any elected officials.

---

[75]    *See PPG*, 146 S.W.3d at 91.

[76]    *See* TEX. HUM. RES. CODE § 36.101(a) ("A person may bring a civil action for a violation of Section 36.002 for the person and for the state. The action shall be brought in the name of the person and of the state.").

[77]    *See* TEXAS CONST. art. IV, § 22 ("The Attorney General shall represent the State in all suits and pleas in the Supreme Court of the State in which the State may be a party …. and perform such other duties as may be required by law."); *id.* art. V, § 21 ("The County Attorneys shall represent the State in all cases in the District and inferior courts in their respective counties; but if any county shall be included in a district in which there shall be a District Attorney, the respective duties of District Attorneys and County Attorneys shall in such counties be regulated by the Legislature.").

Limiting the delegation of government powers to those to whom they are constitutionally assigned is "rooted in the principle of separation of powers that underlies our tripartite system of Government."[78] Article II, § 1 of the Texas Constitution establishes "three distinct departments" of state government, and mandates that "no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others."[79] The phrase prohibiting delegation by or to persons "of one of these departments" refers primarily to public delegations involving other government officials or agencies. But "because delegations to private entities raise more troubling constitutional issues than public delegations, they are subject to more stringent requirements and less judicial deference than public delegations."[80] As the Texas Supreme Court explained in *Texas Boll Weevil Eradication Foundation v. Lewellen*, private delegations must be subjected "to a more searching scrutiny" than their public counterparts:

> On a practical basis, the private delegate may have a personal or pecuniary interest which is inconsistent with or repugnant to the public interest to be served. More fundamentally, the basic concept of democratic rule under a republican form of government is compromised when public powers are abandoned to those who are neither elected by the people, appointed by a public official or entity, nor employed by the government. Thus, we believe it axiomatic that *courts should subject private delegations to a more searching scrutiny* than their public counterparts.[81]

To guide this "searching scrutiny" of private delegations, the Court adopted a multi-

---

[78]      *Texas Boll Weevil Eradication Found., Inc. v. Lewellen*, 952 S.W.2d 454, 465 (Tex. 1997).

[79]      TEX. CONST. art. II, § 1.

[80]      *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 874 (Tex. 2000).

[81]      *Boll Weevil*, 952 S.W.2d at 469 (emphasis added).

factor test of items to consider.[82]

Unlike *Boll Weevil*, this case involves a private delegation of the State's *executive* power to enforce penalties, not its *legislative* power to make rules. Judicial guideposts on private delegation of executive power are few, and generally date from earlier eras in our history. But some of the analysis and factors in *Boll Weevil* apply here, as some of the same problems that require a "more searching scrutiny" of private delegations of legislative power apply to delegations of executive power too.

*First*, "the basic concept of democratic rule under a republican form of government is compromised when public powers are abandoned to those who are neither elected by the people, appointed by a public official or entity, nor employed by the government."[83] HSG is neither elected by the people, appointed by a public official or entity, or employed by the government. If the claims here affect the delivery of health care by reducing information available to doctors or patients, or making them pay for the same information without reimbursement from Medicaid, there will be no one to blame other than a foreign private investment vehicle—or perhaps the courts. This is a burden we do not have the resources to shoulder.

*Second*, HSG "may have a personal or pecuniary interest which is inconsistent with or repugnant to the public interest to be served."[84] The treble damages and civil penalties in the Act reflect a "strong public policy of encouraging insiders and whistleblowers to come forward,"[85] but "may provide a different motivation for those who might traffic in such claims."[86] "It is one thing to place the power of treble

---

[82]   *See id*. at 472.

[83]   *Id*. at 469.

[84]   *Id.*

[85]   *In re Xerox*, 555 S.W.3d 518, 538 (Tex. 2018).

[86]   *PPG Indus., Inc. v. JMB/Houston Centers Partners Ltd. P'ship*, 146 S.W.3d 79, 85 (Tex. 2004) (barring assignment of penalties under the Deceptive Trade Practices Act).

damages in the hands of aggrieved parties or the attorney general; it is quite another to place it in the hands of those considering litigation for commercial profit."[87] Qui tam relators are "less likely than is the Government to forgo an action arguably based on a mere technical noncompliance with reporting requirements that involved no harm to the public fisc."[88] Rejecting white-coat-marketing claims because free nurse and administrative services are not a *kickback* but a *benefit* (as the DOJ found) is not something a for-profit venture like HSG could profitably entertain, much less adopt.

*Third*, the Court in *Boll Weevil* specifically stated that delegating "authority to impose penal sanctions strongly suggests an improper private delegation."[89] Fifty years earlier, the Court held it was permissible to delegate to private parties the right to "recover" part of a civil penalty for their own harm, "but we do not think the Legislature intended for such person to *institute* and *prosecute* such a suit in the name of the State without the joinder of the Attorney General or some district or county attorney."[90] Since 100 percent of the civil remedies provided in the Act here are penal in nature, that "strongly suggests an improper private delegation."[91]

History also shows that private delegation of potentially severe punitive powers has sometimes led courts to stretch statutes beyond what their text can bear. As the Texas Supreme Court wrote in 1853, and repeated in 2024, in construing "highly penal statutes" courts have sometimes "resorted to what may seem to be even strained construction in cases of doubtful guilt to avert the terrible penalty

---

[87] *Id.*

[88] *Hughes Aircraft Co. v. U.S. ex rel. Schumer*, 520 U.S. 939, 949 (1997).

[89] *Boll Weevil*, 952 S.W.2d at 474.

[90] *Agey v. Am. Liberty Pipe Line Co.*, 172 S.W.2d 972, 974 (Tex. 1943) (emphasis added).

[91] *Boll Weevil*, 952 S.W.2d at 474.

denounced by the law."[92] While we must attempt to construe statutes to avoid any constitutional problems,[93] if we sacrifice textual fidelity in legal documents by doing so, then we lose the advantages that faithfulness to the text accomplishes—namely, making the law more transparent and predictable to people and companies alike.[94]

The question presented here is not whether state agencies or officials can hire private attorneys to represent the State in court; they can. "[T]he Legislature may authorize an agency to retain private counsel to prosecute actions, as long as such counsel's authority is subordinate to that of the Attorney General, County Attorney, or District Attorney."[95] That rule is expressly stated in the Act here,[96] and the Supreme Court in the past has "construed" statutes as incorporating this constitutional requirement even if they did not say so.[97]

But a different rule appears to apply when the Attorney General or another constitutional officer rejects the opportunity to exercise control of a private party's

---

[92]    *Malouf v. State ex rels. Ellis*, 694 S.W.3d 712, 721 (Tex. 2024) (quoting *Estes v. State*, 10 Tex. 300, 309 (1853)).

[93]    *Abbott v. Harris County*, 672 S.W.3d 1, 16 (Tex. 2023).

[94]    *See, e.g., Malouf*, 694 S.W.3d at 732 (Young, J., dissenting) ("The Court instead imposes an implausible reading that no one would have given it when it was written…. According to the Court, a lie about who 'actually provided the service' is just as good as the truth, so long as the unnamed person who did it was a dentist."); *Flores v. Millennium Interests, Ltd.*, 185 S.W.3d 427, 437 (Tex. 2005) (Brister, J., dissenting) ("[T]he Court 'strictly' construes the statute to require fewer items than the statute itself says 'must' be included. That is not a very strict construction.").

[95]    *El Paso Elec. Co. v. Texas Dep't of Insurance*, 937 S.W.2d 432, 439 (Tex. 1996).

[96]    TEX. HUM. RES. CODE § 36.105 ("The attorney general may contract with a private attorney to represent the state in an action under this subchapter with which the state elects to proceed.").

[97]    *El Paso Elec.*, 937 S.W.2d at 439 (upholding law authorizing agency's receiver to hire private attorneys "as long as such counsel's authority is subordinate to that of the Attorney General"); *Maud v. Terrell*, 200 S.W. 375, 376–77 (Tex. 1918) (upholding statute authorizing Comptroller to hire private attorneys to collect inheritance taxes, as "it does not exclude the idea that this shall be in subordination to the authority of the county attorney"); *Terrell v. Sparks*, 135 S.W. 519 (Tex. 1911) (upholding law authorizing Attorney General to hire private attorneys as special counsel for specific work).

suit filed on behalf of the State to exercise sovereign duties like collecting civil fines. In *Agey v. American Liberty Pipe Line Company*, the Supreme Court held that while the Legislature could permit a private party to *recover* a statutory civil penalty, "we do not think the Legislature intended for such person to institute and *prosecute* such a suit in the name of the State without the joinder of the Attorney General or some district or county attorney."[98] And in *Staples v. State*, the Court held that private persons could not file a quo warranto action to remove a candidate from an election ballot where it was "nowhere shown in the petition that any county attorney or district attorney of the state or the Attorney General consented to or joined in the suit," and that such approval was required "before the suit may be instituted."[99]

The real parties argue that a private qui tam plaintiff is always subordinate to the Attorney General, because the latter has a statutory right to review filings,[100] object to dismissal by a private plaintiff,[101] and choose to intervene later upon showing good cause.[102] But that proves too much; the Attorney General has a statutory right to receive notice and intervene in almost *any* action in which a party challenges "the constitutionality of a statute of this state."[103] If that alone were enough, private volunteers could claim to represent the State in every suit alleging that a state law is unconstitutional by pointing to the same level of "control."

The Attorney General has sole discretion to decide whether to take over responsibility for a private party's case under the Act.[104] But he does not have sole

---

[98]     *Agey*, 172 S.W.2d at 974 (emphasis added).

[99]     245 S.W. 639, 639, 643 (Tex. 1922).

[100]    *See* TEX. HUM. RES. CODE § 36.102(a).

[101]    *Id*. § 36.102(e).

[102]    *Id*. § 36.104(b-1).

[103]    *See* TEX. GOV'T CODE § 402.010.

[104]    TEX. HUM. RES. CODE § 36.104.

discretion to decide whether allowing a private party to proceed unilaterally to exercise uniquely public duties violates the Texas Constitution; that is ultimately for courts.[105] When traditional civil claims are commandeered for use as "vehicles for commercial investment" and "as avenues for entrepreneurial business development," Texas law requires that "the courts of this state must scrutinize the circumstances on a case-by-case basis to determine if the arrangement undermines the tenets and purpose of the [chosen] vehicle."[106] Such scrutiny may not apply to qui tam cases falling within the Act's intended focus, which is "encouraging insiders and whistleblowers to come forward."[107] But in a clear case of rent-seeking by an out-of-state private enterprise (one that may not even be registered to do business or file suit in Texas[108]), and that asserts claims that may do more harm than good if successful, the privilege of suing in the State's name cannot be delegated to a private party without joinder or affirmative approval by one of the constitutional officers accountable to the people for representing the State's interests in court.

## C. Practical objections: mootness and federal funds

Finally, assuming Novartis's constitutional claims have merit, HSG raises two potential concerns that it says counsel against recognizing those claims here: mootness and loss of federal funds.

---

[105] The parties do not address whether Novartis's constitutional objections assert facial or as-applied challenges. But "the usual judicial practice is to determine an as-applied challenge before addressing a facial challenge." *King Street Patriots v. Texas Democratic Party*, 521 S.W.3d 729, 732 (Tex. 2017).

[106] *Southwestern Bell Tel. Co. v. Mktg. on Hold Inc.*, 308 S.W.3d 909, 918 (Tex. 2010).

[107] *In re Xerox*, 555 S.W.3d at 538.

[108] The Texas Secretary of State's online records do not show HSG has registered to do business in Texas. *See* TEX. BUS. ORGS. CODE §§ 9.001, 9.005. Unregistered foreign entities "may not maintain an action, suit, or proceeding in a court of this state" until registered. *See id*. § 9.051(b). But this issue is not before us since the record does not reflect that Novartis raised it below by verified pleading. *See* TEX. R. CIV. P. 93(1); *Coastal Liquids Transp., L.P. v. Harris County Appraisal Dist.*, 46 S.W.3d 880, 885 (Tex. 2001).

HSG argues that mandamus review would be wasted here because despite the passage of six years, the Attorney General could render these constitutional issues moot by requesting to take over the case.[109] I agree that would probably render Novartis's complaints moot, both as to constitutional standing[110] and separation of powers.[111] But mandamus relief is not rendered moot by compliance *after* relief is granted; that is exactly what mandamus is for. Mandamus relief is based on the facts existing at the time an order is challenged; it is not rendered moot because problems in the order can be fixed at a later time by a party not currently before the Court.[112] Until intervention occurs, we must conduct mandamus review based on the facts the parties have presented to us in the record, not as the parties may "hustle[] to change them thereafter."[113]

HSG also argues that if Novartis prevails, it will "reduce federal funding for Texas Medicaid." That of course is a serious concern; "Many state programs and offices—including Medicaid, police departments, environmental agencies, etc.— depend at least in part for their continued existence on collecting revenue in the form of penalties."[114] Federal and state governments share Medicaid costs, both on the front end when they pay providers, and on the back end if they recover payments in

---

[109]  *See* TEX. HUM. RES. CODE § 36.104(b-1).

[110]  *See Patel v. Texas Dep't of Licensing & Regul.*, 469 S.W.3d 69, 77 (Tex. 2015) (holding that standing for one plaintiff is enough for jurisdiction if all plaintiffs seek the same relief).

[111]  *See El Paso Electric Co. v. Texas Dept. of Ins.*, 937 S.W.2d 432, 439 (Tex. 1996) ("[T]he Legislature may authorize an agency to retain private counsel to prosecute actions, as long as such counsel's authority is subordinate to that of the Attorney General.").

[112]  *See In re M-I L.L.C.*, 505 S.W.3d 569, 574 (Tex. 2016) (court considering whether to grant mandamus relief limited to facts before the trial court at the time of the challenged ruling).

[113]  *In re Allied Chemical Corp.*, 227 S.W.3d 652, 655 (Tex. 2007).

[114]  *See Nazari v. State*, 561 S.W.3d 495, 508 (Tex. 2018).

a fraud suit.[115] But since 2007,[116] federal law has provided a bonus shifting 10 percent of any federal recovery in fraud suits to the states if they have a fraudulent claims law that meets certain federal requirements (as Texas does).[117] HSG argues that if Novartis prevails here, Texas will lose that bonus.

HSG does not suggest that we can disregard constitutional rules simply to get more federal funds. Constitutional limits are not set aside so the State can collect more money.[118] HSG instead argues that Article III, § 51-a of the Constitution specifically authorizes the Legislature to "enact such laws as may be necessary in order that such federal matching money will be available for assistance and/or medical care for or on behalf of needy persons."[119] It is not clear whether "federal matching money," as understood by Texas voters in 1965 when they amended the Constitution to add § 51-a,[120] included a bonus on qui tam suit recoveries that did not exist until 40 years later.[121] But assuming that it does, the only federal requirement at issue is whether our state Act "contains provisions that are at least as effective in rewarding and facilitating qui tam actions for false or fraudulent claims as those described in [the False Claims Act]."[122] That requirement compares the state and federal *statutes*; it does not disqualify the bonus based on federal review of state

---

[115]    *See* 42 U.S.C. § 1396d(b).

[116]    Deficit Reduction Act of 2005, ch. 3, sec. 6031, Pub. L. 109–171, title VI, § 6031(a), 120 Stat. 72, 72–73 (2006) (effective Jan. 1, 2007).

[117]    *See* 42 U.S.C. § 1396h(a); *see also In re Xerox*, 555 S.W.3d at 538.

[118]    *Cf. South Dakota v. Dole*, 483 U.S. 203, 210 (1987) (Congress's spending power "may not be used to induce the States to engage in activities that would themselves be unconstitutional.").

[119]    TEX. CONST. art. III, § 51-a(c).

[120]    TEX. H.R. RES. 81 § 1, 59th Leg., R.S. (1965) (adopted at the Nov. 2, 1965 election).

[121]    Deficit Reduction Act of 2005, ch. 3, sec. 6031, Pub. L. 109–171, title VI, § 6031(a), 120 Stat. 72, 72–73 (2006).

[122]    42 U.S.C. § 1396h(b)(2).

procedural, jurisdictional, or court rules that might result in a smaller recovery in a particular case. Moreover, such a blanket rule might require the Attorney General to intervene in *all* qui tam cases, since doing so reduces a qui tam plaintiff's recovery by 10 percent by shifting a substantial part of that to the State.[123]

## CONCLUSION

The issues in this case are matters of first impression and of first importance—to the State's health care programs, its budget, and its civil justice system. All of these programs will either attract or repel those considering relocating to Texas; none of them will benefit—and all three may be harmed—by attracting foreign bounty hunters seeking booty based on claims that free services benefitting health care are actually kickbacks that should be severely punished. If "qui tam provisions are based upon the idea of 'setting a rogue to catch a rogue,'"[124] the Texas Constitution plainly prohibits replacing the State's elected executives with unelected rogues.

How soon we forget. "[I]nsisting on a wasted trial simply so that it can be reversed and tried all over again creates the appearance not that the courts are doing justice, but that they don't know what they are doing."[125] It took years of sustained effort by the Executive, Legislative, and Judicial branches of this State to curb windfall claims like this 30 years ago, and the State, its economy, and its people have flourished as a result. Courts have no warrant to undo all that now.

Because HSG lacks constitutional standing and the Act violates separation of powers to the extent it allows a private plaintiff to enforce civil penalties without involvement of the State, I dissent from the majority's denial of mandamus relief.

---

[123]  *See* TEX. HUM. RES. CODE § 36.110 (providing 25 to 30 percent of suit proceeds to qui tam plaintiff if the State does not take over a case, reduced to 15 to 25 percent if it does).

[124]  *Mortgages, Inc. v. U.S. Dist. Court for Dist. of Nev. (Las Vegas)*, 934 F.2d 209, 213 (9th Cir. 1991) (citing Cong. Globe, 37th Cong. 3d Sess. 955–56 (1863) (remarks of Sen. Howard)).

[125]  *In re McAllen Med. Ctr., Inc.*, 275 S.W.3d 458, 466 (Tex. 2008).

/s/     Scott A. Brister

Scott A. Brister
Chief Justice

Dissenting Opinion by Chief Justice Brister